Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MONICA DAWKINS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA DAWKINS, on behalf of herself and all similarly situated persons,<br><br>          Plaintiff,<br><br>v.<br><br>UNILEVER UNITED STATES, INC., a Delaware corporation,<br><br>          Defendants. | Case No: 5:25-cv-02378-SVW-DTB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>   **1) CAL. PENAL CODE § 638.51** |

1

Plaintiff MONICA DAWKINS ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant UNILEVER UNITED STATES, INC., a Delaware corporation ("Defendant" or "UNILEVER"), a Delaware corporation with its principal of business in New Jersey. Plaintiff brings this action based upon personal knowledge of the facts pertaining to her and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.dove.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, that function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users such as Internet Protocol (IP) addresses, session data, clickstream activity, and form inputs in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

5.     When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.     When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Meta (Facebook Pixel)
- The Trade Desk
- Rubicon/Magnite

7.     The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.     The Trackers are operated by separate and distinct third parties, including: Meta Platforms, Inc. (which operates the Facebook Pixel), The Trade Desk, Inc. (which provides demand-side advertising and identity-graph services), Magnite, Inc. (formerly the Rubicon Project, which operates supply-side and programmatic advertising exchanges), and other ad-tech intermediaries (collectively, the "Third Parties"). Defendant configures and enables these Trackers by embedding their scripts, pixels, and tags into the Website. When executed, these Trackers cause users' browsers to transmit session metadata, unique identifiers, device and network information, and behavioral interaction data to third-party servers. The transmitted information is then used by the Third Parties to identify and profile users, optimize and deliver targeted advertising, and monetize user data within programmatic advertising and data-brokerage ecosystems.

9.     On information and belief, the Website employs other trackers not identified above including but not limited to Tik Tok Pixel, Pinterest Pixel, Google, Snap Chat, and New Relic among others.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

10.     Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, installed fonts, color depth, timezone, operating system, pages visited, session duration, scroll depth and/or mouse movement, touch movements and/or tap behavior, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP (collectively, "User Information"). This information is used for behavioral profiling, geolocation tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted marketing and advertising that enable Defendant to monetize its Website.  That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

11.     Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc*., 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

12.     The allegations here are made more invasive by the entities operating the Trackers and collecting Plaintiff's and Class Members' IP addresses and User Information. Google (Analytics, Ads, DoubleClick, Tag Manager), Meta (Facebook Pixel), Rubicon, and Magnite combine the information they collect about Website users with information from other websites and add the IP addresses and User Information of Website users to comprehensive user profiles and use that information to track Plaintiff and Class Members across the Internet. Those data profiles are then provided to advertisers for more targeted and tailored advertising based on a broad universe of information.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

13.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way. By installing and using the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

14.    By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated California Penal Code § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

15.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    **PARTIES**

16.    Plaintiff MONICA DAWKINS is a California citizen residing in Riverside County and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred within the statutory period.  The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17.    Defendant UNILEVER UNITED STATES, INC. is a Delaware corporation that owns, operates, and/or controls the Website which is an online platform that offers goods and services to consumers.

18.    UNILEVER is one of the world's largest consumer goods companies, with United States headquarters in Englewood Cliffs, New Jersey. As of 2025, UNILEVER markets and sells hundreds of household, personal care, food, and beverage brands used daily by billions of consumers across the globe.

19.    UNILEVER employs tens of thousands of people worldwide. Its core business revolves around manufacturing, marketing, and distributing branded consumer products, including packaged foods, beverages, beauty and personal care items, and home cleaning solutions. UNILEVER's operations are supported by a global supply chain and extensive digital commerce infrastructure.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

20.     The Website is the cornerstone of UNILEVER's U.S. digital consumer engagement strategy and serves as a comprehensive online platform. It allows customers to explore product information, nutrition details, promotions, recipes, and brand initiatives, while also facilitating e-commerce integration with retail partners. The Website includes features such as personalized product recommendations, loyalty program enrollment, and access to digital coupons and offers.

21.     The Website is also deeply integrated into UNILEVER's marketing, brand engagement, and consumer data ecosystem, supporting services such as mobile application integration, digital advertising campaigns, and cross-brand promotions. Beyond its role as an informational and promotional platform, the Website functions as a data collection and consumer engagement hub, enabling advanced personalization and targeted marketing based on users' browsing behavior, preferences, and purchasing patterns.

### III.    JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

23.     PeeringDB is a publicly accessible, industry-maintained database used by Internet carriers, cloud providers, and data-center operators to publish the geographic locations of their network interconnections ("Internet Exchange Points" or "IXPs") and the Autonomous System Numbers ("ASNs") that operate within them. Each record identifies the physical facilities where a company's network peers with other networks to exchange traffic, along with the city, region, and facility operator (e.g., Equinix, CoreSite). Because entries are maintained by the network operators themselves and verified by the PeeringDB community, the database is a reliable, judicially noticeable source for determining where specific routing and interconnection infrastructure is

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

located. Accordingly, PeeringDB data is commonly used in network-forensics and jurisdictional analyses to show that Internet traffic was routed through particular geographic facilities. As reflected below, PeeringDB confirms that the domains contacted during Plaintiff's browsing session correspond to networks peering through California Internet exchange facilities, including Equinix SV1 (San Jose) and CoreSite LA1 (Los Angeles).

24.    When Plaintiff accessed the Website, her browser initiated outbound requests to multiple third-party endpoints operated by entities with significant infrastructure or corporate presence in California. Connections to cm.g.doubleclick.net, www.googletagmanager.com, www.google.com, and www.googleadservices.com reflect integration with Google's advertising and measurement networks,[1] all hosted within Google's AS15169, which maintains major interconnect facilities at Equinix SV1 (San Jose) and CoreSite LA1 (Los Angeles). Requests to connect.facebook.net evidence Meta's tracking pixel;[2] Meta operates its U.S. engineering headquarters and primary data clusters in Menlo Park and Fremont, California. Similarly, insight.adsrvr.org and match.adsrvr.org confirm interaction with The Trade Desk[3]—whose SEC filings identify its headquarters and West-Coast data-processing nodes in Ventura and San Jose.

25.    Adobe's tag container (assets.adobedtm.com) resolves through Akamai's Los Angeles and San Jose PoPs ([4] & [5]). TikTok's analytics domain (analytics.tiktok.com) peers through Equinix SV1 and CoreSite LA1 under ASN 138699.[6] Pinterest's ad endpoint (ct.pinterest.com) and asset loader (s.pinimg.com) both

---

[1] **Google LLC** — PeeringDB AS15169 lists California IX facilities in *Equinix SV1 (San Jose)* and *CoreSite LA1 (Los Angeles).* https://www.peeringdb.com/net/433

[2] Meta Platforms, Inc. — Headquarters and engineering data centers in *Menlo Park* and *Fremont, CA.* https://investor.fb.com

[3] The Trade Desk, Inc. — Corporate headquarters in *Ventura, CA* and data-processing sites in *San Jose.* https://investors.thetradedesk.com

[4][4] Adobe Inc. — Headquarters in *San Jose, CA;* Akamai edge PoPs for assets.adobedtm.com confirmed in *Los Angeles* and *San Jose.* https://www.peeringdb.com/net/13

[5] Akamai Technologies, Inc. — PeeringDB AS20940 lists California facilities in *San Jose* and *Los Angeles.* https://www.peeringdb.com/net/95

[6] TikTok Inc. — PeeringDB AS138699 lists Equinix SV1 and CoreSite LA1 California exchange points for TikTok CDN. https://www.peeringdb.com/net/27595

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  operate within AWS us-west-2/-1 footprints servicing California users.[7] New Relic (js-
2  agent.newrelic.com) maintains a large operational presence in San Francisco and
3  processes telemetry via AWS us-west-1.[8]

4        26.    Collectively, these connections show that the Website integrated multiple
5  third-party services that routed user traffic through California-based networks and data
6  centers. The active participation of these California entities—Google, Meta, Adobe, The
7  Trade Desk, OneTrust, Pinterest, New Relic, and TikTok—establishes that data
8  associated with the session was processed within California and that the Defendant
9  knowingly relied on California-located advertising and consent infrastructure. This
10 constitutes purposeful availment of California's technological and regulatory ecosystem
11 for data collection and behavioral targeting.

12       27.    The Website incorporated the OneTrust consent-management framework,
13 which executes geolocation queries to geolocation.onetrust.com and displays a
14 "California Consumer Privacy Act (CCPA)" opt-out banner to users whose IP addresses
15 resolve to California. The presence of California-specific labeling and decision logic
16 confirms that Defendant purposefully configured its privacy workflows to identify,
17 segment, and process the data of California residents separately from other users. This
18 conduct demonstrates deliberate targeting of the California market and purposeful
19 engagement with its statutory privacy regime.

20       28.    Defendant knowingly embedded tracking code and SDKs supplied by
21 entities headquartered in California—including Meta Platforms, Inc. (Menlo Park), The
22 Trade Desk, Inc. (Ventura), and Magnite, Inc. (Los Angeles)—each of which operates
23 advertising or identity-resolution infrastructure within the state. By contracting for or
24 deploying these services, Defendant authorized California companies to intercept and
25 process data flows originating from Website visitors physically located in California,

26

27 _____

[7] Pinterest Inc. — Headquarters in *San Francisco, CA;* AWS us-west region hosts CDN assets for
pinimg.com. https://investor.pinterestinc.com
28 [8] New Relic, Inc. — Headquarters in *San Francisco, CA,* using AWS us-west-1 infrastructure for
telemetry ingestion. https://newrelic.com/about

thereby establishing continuous and systematic commercial relationships with California-based intermediaries.

29.    Defendant's own privacy disclosures acknowledge that California residents have enhanced rights under state law and provide a dedicated "Do Not Sell My Personal Information" link in the Website footer. The HAR evidence further shows that OneTrust's module performs IP-based jurisdiction detection, meaning Defendant can foresee when California visitors' communications will be captured by the embedded trackers. Because Defendant designed the Website to collect and monetize data from users it knows to be within California, the resulting privacy injuries to those users were plainly foreseeable and satisfy the effects test for specific jurisdiction.

30.    Beyond its technical integrations, Defendant's commercial ecosystem is intertwined with California's data-broker and ad-exchange market. The embedded third-party vendors LiveRamp Inc. and The Trade Desk Inc. are registered data brokers with the California Privacy Protection Agency and/or maintain principal offices within the state. Defendant's participation in this California-centered data economy, combined with its operation of CCPA-mandated interfaces, reflects an ongoing course of conduct that acknowledges and leverages California's regulatory and technological infrastructure, further supporting the exercise of personal jurisdiction.

31.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) Plaintiff resides in this District; and (4) the injury to Plaintiff occurred within this District.

## IV.    <u>GENERAL ALLEGATIONS</u>

### 1.    *The California Invasion of Privacy Act (CIPA)*

32.    Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications.

The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

33.    CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

34.    A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

35.    Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents (Cal. Penal Code § 638.50(b)).

36.    In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

37.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

38.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

39.     Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address and the subject line, capturing the incoming information.

40.     Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

41.     The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).)

42.     Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under

1    Article III. (*See Campbell v. Facebook, Inc.*, 2020 WL 1023350; *In re Facebook Internet*
2    *Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).)

3    43.    Individuals may pursue legal action against violators of any CIPA
4    provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties
5    per violation (Cal. Penal Code § 637.2(a)(1)).

6    **2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

7    44.    When the Plaintiff and Class Members accessed the Website, their browsers
8    initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which
9    hosts the content and functionality of the site. In response, the server transmitted an
10   HTTP response containing the necessary resources, including HTML, cascading style
11   sheets (CSS), JavaScript files, and image assets, used by the browser to render and
12   display the webpage. These resources also included client-side scripts that initiate
13   communication with third-party services for analytics, marketing, and tracking purposes.
14   The server's instructions include how to properly display the Website, *e.g.* what images
15   to load, what text should appear, or what music should play.

16   45.    In addition, the server's instructions included client-side scripts that initiate
17   communication with third-party services for analytics, marketing, and tracking purposes.
18   The instructions cause the Trackers to be installed on a user's browser.  The Trackers
19   then cause the browser to send identifying information—including the user's IP address
20   and User Information to the Third Parties.  These Third Parties, through their Trackers,
21   also set a cookie on Website users' browsers, which sends a unique identifier to these
22   Third Parties that allows them to track users on the Website over multiple visits and
23   across the Internet.

24   46.    A general diagram of this process is pictured at Figure 1, which explains
25   how Defendant's Website transmits instructions back to users' browsers in response to
26   HTTP requests.

27
28   / / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 1:**



47.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests,  to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

48.    The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

49.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers.  Nor did Defendant obtain a court order before installing or using the Trackers.

50.    An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g.,

191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[9]

51.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

52.    Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

53.    Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

54.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can

---

[9] *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

55.     The distinction between a public and private IP address is fundamental to the architecture of modern networks.     Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication.   And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

56.     An analogy is useful.  A public IP address is like the number for a landline telephone for a household.  A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2").  Alot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

57.     The same is true of IP addresses.   The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[10]

/ / /

/ / /

/ / /

---

[10] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

58.     Thus, the differences between public and private IP addresses are as follows:[11]

**Figure 3:**

| Category | Private IP address | Public IP address |
| --- | --- | --- |
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br>10.0.0.0 – 10.255.255.255,<br>172.16.0.0 – 172.31.255.255,<br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

59.     A public IP address is therefore "routing, addressing, or signaling information."    A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing

---

[11] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

60.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

61.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

62.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[12]

63.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[13]

64.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[14] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[15]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[16] because

---

[12] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[13] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[14] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[15] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[16] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

17

1  "[c]ompanies can use an IP address … to personally identify individuals."[17]

2  65.   In fact, a public IP address is a common identifier used for "geomarketing,"
3  which is "the practice of using location data to identify and serve marketing messages to
4  a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve
5  [their] audience by giving [them] an inside look into where they are, where they have
6  been, and what kinds of products or services will appeal to their needs."[18]  For example,
7  for a job fair in specific city, companies can send advertisements to only those in the
8  general location of the upcoming event.[19]

9  66.   "IP targeting is a highly effective digital advertising technique that allows
10 you to deliver ads to specific physical addresses based on their internet protocol (IP)
11 address. IP targeting technology works by matching physical addresses to IP addresses,
12 allowing advertisers to serve ads to specific households or businesses based on their
13 location."[20]

14 67.   "IP targeting capabilities are highly precise, with an accuracy rate of over
15 95%. This means that advertisers can deliver highly targeted ads to specific households
16 or businesses, rather than relying on more general demographics or behavioral data."[21]

17 68.   In addition to "reach[ing] their target audience with greater precision,"
18 businesses are incentivized to use a customer's public IP address because it "can be more
19 cost-effective than other forms of advertising."[22]  "By targeting specific households or

20
21 [17] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.
22 [18] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.
23 [19] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-
24 marketing-campaigns.
25 [20] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV
26 5-5maUaAgtNEALw_wcB.
27 [21] *Id.*
28 [22] Herbert Williams, *The Benefits of IP Address Targeting for Local Busines*ses, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-willi
ams-z7bhf.

18

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[23]

69.     In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[24]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[25]

70.     The collection of IP addresses here is particularly invasive here:  As a report from NATO found:

> [a] data broker may receive information about a[]
> [website] user, including his … IP address.  The user then
> opens the [website] while his phone is connected to his
> home Wi-Fi network.  When this happens, the data broker
> can use the IP address of the home network to identify the
> user's home, and append this to the unique profile it is
> compiling about the user.  If the user has a computer
> connected to the same network, this computer will have
> the same IP address. The data broker can then use the IP
> address to connect the computer to the same user, and
> identify that user when their IP address makes requests on
> other publisher pages within their ad network.  Now the
> data broker knows that the same individual is using both
> the phone and the computer, which allows it to track
> behaviour across devices and target the user and their
> devices with ads on different networks.[26]

71.     In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

/ / /

---

[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

72.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[27]

73.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[28]

74.    Often times, third-party scripts are installed on websites "for advertising purposes."[29]

75.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[30]

76.    Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website.  Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

77.    As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser.  This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

78.    Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some

---

[27] Is an IP Address Personal Data?, Convesio, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* What Is Personal Data?, European Commission, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en
[28] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").
[29] *Id*.
[30] *Id*.

20

cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

79.    Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.  Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

80.    At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

**3.    *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

81.    Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

82.    The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

83. This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

84. When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

85. The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

86. In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic metadata flows. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

87. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

88. When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.** ***Plaintiff And Class Members' Data Has Financial Value***

89. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[31]

90. Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[32]

---

[31] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[32] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

91.     There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[33]

92.     Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[34]

93.     In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[35]

/ / /

/ / /

---

[33] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.
[34] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017),
https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data
[35] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28,
https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

24

94.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[36]

95.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

96.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent*

97.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

/ / /

---

[36] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

98.   Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

99.   IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

100.   When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**6.      *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy***

101.   The collection of Plaintiff's and Class Members' personally identifying de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

102.   As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

103.   To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

104.   In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

**a. Data Brokers And Real-Time Bidding: The Information Economy**

*Data Brokers*

105.   While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[37] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the

---

[37] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

106.   Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a). Magnite/Trade Desk is considered a data broker by the State of California.

107.   "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[38]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[39]

108.   For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[40]

109.   Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[41]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political

---

[38] SHERMAN, *supra*, at 2.
[39] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/ 2817946.2817957.
[40] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[41] SHERMAN, *supra*, at 1.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[42]

110.   This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[43]

111.   As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many

> industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

> …

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[44]

/ / /

---

[42] *Id.*
[43] *Id.* at 9.
[44] *Id.*

29

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

112.   Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[45]

**Figure 4:**



///

[45] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

113.    As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[46]

114.    Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[47]

115.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[48]

116.    In short, by collecting IP addresses Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

117.    As a result of Defendant's installation of the trackers of data brokers Magnite and many of the entities the Third Parties sync with on the browsers of users of Defendant's Website, the information of Plaintiff and Class Members is linked to any profiles these data brokers may have about them using their IP addresses Device Metadata, and User Information (or new profiles are created for Plaintiff and Class Members).

/ / /

---

[46] *Id.* at 11.

[47] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[48] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

118.   These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles.  Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

119.   Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information?  This is where real-time bidding comes in.

120.   "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[49]

121.   "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP work[s] with website or app publishers to help them participate in the RTB process."  "DSPs [which is what The Trade Desk is[50]] primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[51]  And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[52]

/ / /

---

[49] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.
[50] HTTPS://WWW.THETRADEDESK.COM/OUR-DEMAND-SIDE-PLATFORM ("The leading demand-side platform for data-driven advertising").
[51] *Id.*
[52] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

122.   In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like The Trade Desk help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

123.   The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.   This information can be added to existing dossiers DSPs have on a user.[53]

**Figure 5:**



---

[53] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

124.   Facilitating this real-time bidding process means SSPs such as Magnite and DSPs such as Rubicon must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids.  These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road.  The DSP enlists a final actor, the data management platform (DMP) [or a data broker].  DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.  The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[54]

**Figure 6:**



125.   In other words, SSPs such as Magnite can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the

---

[54] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

126.    Likewise, a DSP like The Trade Desk can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

127.    All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

128.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

    a.    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

    b.    "send[ing] sensitive data across geographic borders."

    c.    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[55]

129.    Given Rubicon operates a SSP here, the last point is particularly relevant, as it means Rubicon collects and discloses Website users' information to *all prospective*

---

[55] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/ unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  *advertisers*, even if advertisers do not ultimately show a user an advertisement.  This

2  greatly diminishes the ability of users to control their personal information.

3    130.  Likewise, the Electronic Privacy Information Center ("EPIC") has warned

4  that "[c]onsumers' privacy is violated when entities disclose their information without

5  authorization or in ways that thwart their expectations."[56]

6    131.  For these reasons, some have characterized "real-time bidding" as "[t]he

7  biggest data breach ever recorded" because of the shear number of entities that receive

8  personal information[57]:

9  **Figure 7:**



22    132.  All of this is in line with protecting the right to determine who does and

23  does not get to know one's information, a harm long recognized at common law and one

24  the CIPA was enacted to protect against.  *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985)

25  (noting the CIPA was drafted with a two-party consent requirement to protect "the right

26  to control the nature and extent of the firsthand dissemination of [one's] statements");

27  _____

28  [56] Geoghegan, *supra*.
[57] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

133.  It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers like Magnite who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids).  The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

134.  Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[58]  This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[59]

135.  Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of*

---

[58] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[59] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

*tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[60]

**Figure 8:**



136.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2

---

[60] Papadopoulos, *supra*, at 1433.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[61]

137. On the flip side, "CSync may re-identify web users even after they delete their cookies."[62] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[63] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[64]

138. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[65]

139. Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website (*e.g.*, Experian, Epsilon, TransUnion, the Third Parties between one another). The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from actually being anonymous when they visit the Website.

140. To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the

---

[61] Papadopoulos, *supra*, at 1434.
[62] *Id*.
[63] *See id*.
[64] *Id*.
[65] *Id.* at 1441.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles.  Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible.  And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

141.    Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

142.    Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

143.    Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system.  In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

144.    When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

40

145.   On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

146.   Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

147.   The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

148.   Rubicon operates as a supply-side platform that facilitates real-time bidding, audience targeting, and cross-platform ad delivery within the programmatic advertising ecosystem. Through its exchange infrastructure, Rubicon aggregates behavioral and contextual data captured from the Website and makes this data available to demand-side platforms and advertisers. Rubicon participates in identifier syncing and cookie matching across advertising networks, enabling pseudonymous identifiers to be linked with browsing activity across multiple domains and devices. These practices

41

allow Rubicon to enrich audience data and construct persistent user profiles that extend beyond a single session or publisher site. By converting raw behavioral signals into standardized, targetable audience segments, Rubicon monetizes Website visitor data and integrates it into broader programmatic advertising marketplaces.

149.    Magnite also operates as a supply-side platform that enables publishers to sell digital advertising inventory through real-time bidding, audience segmentation, and programmatic exchanges.

## 7.    *Plaintiff's Personal Private Behavioral Information Was Explicitly Shared With the Third Parties*

150.    Based on Plaintiff's personal and direct interaction with the Website, her browser generated and transmitted detailed records of what pages she viewed, how she navigated between them, and how long she remained on each page. These transmissions included product-specific URLs, referrer links identifying the sequence of pages visited, and timing values indicating user engagement. Such data reflected the substance of Plaintiff's browsing behavior rather than merely technical connection information.

151.    During one of Plaintiff's visits to the Website, Defendant's integration with Google's analytics and advertising platforms caused the browser to disclose the full address of each page viewed, the prior page from which Plaintiff arrived, and the duration of her engagement on that page. For example, the data transmitted identified Plaintiff's viewing of the Body Wash section of the Website following a navigation from the Home page, together with a millisecond-level record of time spent before continuing to another page.

152.    Defendant's use of Meta's tracking pixel caused Plaintiff's browser to send event data labeled "PageView," together with the address of the Deodorant product page and the referring Home page. These values confirm that Meta received and logged Plaintiff's page-to-page movement within the Website and recorded which specific product categories she viewed.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

153.    When Plaintiff accessed the Shampoo section of the Website, embedded TikTok analytics code caused a "PageView" event to be transmitted identifying the Shampoo product page as both the active and referring location. This communication reflects TikTok's receipt of direct behavioral information describing Plaintiff's interaction with that portion of the Website.

154.    Defendant's Pinterest advertising tag recorded a "page visit" event that included the precise address of the Hair-Care category Plaintiff viewed, along with identifiers linking that interaction to Defendant's advertising account. This record demonstrates that Pinterest's systems received concrete data describing Plaintiff's product-level browsing activity.

155.    Plaintiff's visit also triggered communications with Adobe's Experience Cloud infrastructure that carried the page title "Dove US Product Listing" and the content channel "Body Wash." These fields identify the exact portion of the Website being viewed and the thematic category associated with that page, evidencing Adobe's collection of contextual behavioral data.

156.    Collectively, these interactions show that Defendant's Website captured and transmitted granular behavioral information about Plaintiff's browsing session— including the pages she visited, the order in which she viewed them, and the duration of her engagement—to multiple third-party advertising and analytics entities. These facts demonstrate that the Defendant's conduct involved the disclosure of specific, user-level behavioral content rather than the mere exchange of anonymous or technical connection data.

## V.    <u>SPECIFIC ALLEGATIONS</u>

### 1.    *META'S FACEBOOK PIXEL*

157.    The Facebook Pixel ("Meta Pixel") is a JavaScript tracking script embedded into the Website that automatically transmits user activity to Meta Platforms, Inc. ("Meta"). When a user visits the Website, the Pixel initiates requests to Meta's tracking endpoints, such as https://connect.facebook.net/en_US/fbevents.js and

https://www.facebook.com/tr/…, without any user interaction. These calls capture user engagement data including page views, full page URLs, referrer information, timestamps, and device/browser metadata (such as IP address, user-agent, and screen resolution). This data is tied to pseudonymous identifiers, cookies (such as _fbp), and/or Facebook account IDs where available.

158. By transmitting this activity data, the Facebook Pixel enables Meta to perform identity resolution by linking on-site actions to specific users or inferred visitor segments across its platform. For example, when a visitor browses Dove product pages, the Pixel transmits metadata to Meta, which then associates that activity with the user's broader Facebook or Instagram profile (if logged in), or with device/browser fingerprints. This enables advanced advertising functions such as retargeting—showing the same user personalized Dove product ads across Facebook, Instagram, or third-party websites participating in Meta's Audience Network.

159. The screenshot in *Figure 9* demonstrates an automatic GET request to https://connect.facebook.net/en_US/fbevents.js followed by tracking beacon calls to https://www.facebook.com/tr/?id=...&ev=PageView.... These requests are triggered immediately on page load, without the user's consent, and transmit user and session metadata such as the referring URL (https://www.dove.com/...), event type ("PageView"), device and browser specifications, and unique tracking identifiers. This constitutes direct evidence that Meta receives behavioral and technical data as soon as a user lands on the Website.

/ / /

/ / /

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 9:**



160.   Defendant surreptitiously installed, executed, embedded, or injected the Facebook Pixel onto users' browsers by copying the JavaScript snippet (fbevents.js) into the Website. Once executed, the script triggers outbound requests that include user metadata, routing information, and identifiers, thereby integrating Meta's behavioral advertising infrastructure into the Website.

161.   The Facebook Pixel is at least a "process" because it is software that identifies consumers, collects and organizes user data, and correlates that data for profiling and targeting.

162.   The Facebook Pixel is at least a "device" because it requires execution on the user's computing device (browser) to function, and once executed, it actively captures and transmits data. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

163.   The Facebook Pixel captures non-content signaling information such as IP addresses, referrer headers, full URL paths, timestamps, browser fingerprints, and device

1    details. This metadata constitutes addressing and routing information related to the user's

2    interactions with the Website.

3        164.    Wire Shark's DNS timeline independently confirms routing signals to

4    Meta's tracking infrastructure at the network level corroborates the Dev Tools findings,

5    which is set forth below:

6                                   **Figure 10:**



20        165.    Through this process, Meta systematically engages in persistent user

21    tracking, behavioral profiling, and audience segmentation, all without the user's

22    knowledge, awareness, or meaningful consent.

23        166.    By embedding the Facebook Pixel, Defendant enabled Meta to track user

24    behavior across unrelated third-party websites that also deploy the Pixel or Meta's

25    Audience Network code. The Pixel assigns persistent identifiers that allow Meta to

26    monitor user browsing habits across the broader web, compiling longitudinal behavioral

27    profiles of Website visitors that extend well beyond their interaction with the Dove

28    Website.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

167.   The Pixel initiates direct connections to Meta's tracking servers (connect.facebook.net and facebook.com/tr) upon page load. These connections transmit addressing and signaling data, including IP addresses, user-agent strings, referrer headers, and event payloads. This supports Meta's cross-site user identification, synchronization with its advertising partners, and the construction of targeted audience segments for programmatic advertising. Accordingly, the Facebook Pixel functions as a pen register and/or trap and trace device and/or process.

168.   Defendant never obtained a court order authorizing installation of a pen register or trap and trace device, nor did it obtain Plaintiff's or Class Members' consent to transmit their personal data to Meta through the Pixel.

169.   Defendant's undisclosed deployment of the Facebook Pixel on the Website constitutes a violation of CIPA by enabling Meta's interception of communications and unauthorized use of pen register and/or trap and trace processes without judicial authorization or user consent.

170.   Figures 9 and 10 together provide a cohesive overview of how Defendant deploys third-party tracking technology to monetize user activity on the Website. Figure 9 shows the Meta Pixel's automatic execution of outbound connections to connect.facebook.net and facebook.com/tr upon page load, transmitting page-view events, full URLs, referrer paths, timestamps, and device identifiers to Meta's advertising infrastructure. Figure 10 corroborates those transmissions at the network level, confirming live routing from users' browsers to Meta's tracking servers. Taken as a whole, the figures demonstrate that Defendant's use of the Meta Pixel is a purposeful component of its digital marketing system—capturing visitor behavior in real time and feeding it into Meta's advertising ecosystem to enable retargeting, audience expansion, and measurable revenue generation from each consumer interaction with the Website.

## 2.    THE TRADE DESK

171.   The Trade Desk Tracker, typically delivered from domains such as insight.adsrvr.org, is a third-party behavioral tracking pixel embedded into the Website

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

either through page code or injected dynamically via a tag manager. When a user visits the Website, the tracker establishes a connection with The Trade Desk's advertising and analytics servers. This communication transmits data points such as IP address, user-agent string, browser type/version, referrer URL, full page path, and unique cookie or device identifiers. The Fiddler log shows an automatic GET request to https://insight.adsrvr.org/track/cei?...&ref=https://www.dove.com/... confirming that the Trade Desk's infrastructure receives session-level data instantly upon page load.

172.    Once activated, the Trade Desk Tracker assigns pseudonymous identifiers that facilitate cross-device recognition and ID syncing across multiple advertising exchanges. By participating in cookie syncing (as indicated in the GET parameters containing cookie_sync=1), the Trade Desk links identifiers across different partner networks, extending user tracking beyond the Dove Website.    This enables the construction of persistent, longitudinal user profiles. The technical routing evidence captured by Fiddler is set forth below:

**Figure 11:**



/ / /

173.    This demonstrates that the Trade Desk received a routed identifier sync tied to the visitor's session from the Dove Website without consent.

174.    From an advertising perspective, the Trade Desk Tracker allows Defendant to retarget visitors who have viewed specific Dove product pages, and to extend those audiences through The Trade Desk's lookalike modeling. This means users who never directly visited the Dove Website can be targeted if they share traits with visitors, based on Trade Desk's aggregated data.

175.    The captured data flows directly into The Trade Desk's programmatic ad exchange, where advertisers bid in real time to reach users. The signals gathered from Dove sessions are thus monetized as tradeable behavioral segments, maximizing Defendant's ad campaign performance while commodifying user activity without consent.

176.    The DNS logs and HTTP request headers confirm that user browsers-initiated background requests to insight.adsrvr.org upon visiting Dove.com, transmitting metadata including IP address, referrer (https://www.dove.com/...), and device/browser information. This constitutes live evidence of Trade Desk's interception of signaling data.

177.    Defendant surreptitiously installed and executed the Trade Desk Tracker on the Website by embedding the script or pixel, ensuring user communications were routed to adsrvr.org domains without the user's knowledge. This constitutes use of a pen register or trap and trace process under CIPA.

178.    The Facebook Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data. The Facebook Tracker is also at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

179.    The Trade Desk captures non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data

1  associated with the user and the Website. This metadata reflects addressing and routing

2  details.

3      180.   Through this process, the Facebook Tracker systematically engages in

4  persistent user tracking, behavioral profiling, and audience segmentation, all without the

5  user's awareness, consent, or meaningful ability to control the collection and

6  dissemination of their personal browsing information. Moreover, by embedding the The

7  Trade Desk onto the Website, Defendant enabled Trade Desk to track users' activity

8  beyond the Website itself. The Facebook Tracker assigns persistent identifiers that allow

9  Trade Desk to monitor user behavior across multiple unrelated websites that also deploy

10  Meta's tracking technology. As a result, Trade Desk is able to compile detailed,

11  longitudinal behavioral profiles of users based not only on their interactions with the

12  Website, but also on their broader browsing activities across the internet. This cross-site

13  tracking occurs without the user's awareness or consent, further exacerbating the privacy

14  invasions resulting from Defendant's conduct.

15      181.   The Trade Desk initiates a connection to Trade Desk advertising servers

16  (typically  at https://www.facebook.com/tr/?id=...) upon page load. This connection

17  transmits routing and signaling metadata, including the user's IP address, user-agent

18  string, full URL path, referrer header, and timestamp. These data points enable Trade

19  Desk to identify both the source and destination of the communication, facilitate user ID

20  synchronization across sites, and support the construction of cross-site user profiles for

21  targeted advertising and audience segmentation. Accordingly, the Trade Desk functions

22  as a pen register and/or trap and trace device and/or process.

23      182.   Defendant never obtained a court order permitting the installation of a pen

24  register or trap and trace device or process and did not obtain Plaintiff's or the Class

25  Members' consent to install the Trade Desk or to collect or share data with Trade Desk.

26  Defendant's secret installation of the Trade Desk on the Website violates CIPA

27  regarding unauthorized use of a pen register and/or trap and trace device without prior

28  consent or court order.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

### 3.    *RUBICON/MAGNITE*

183.    The Magnite (Rubicon Project) Tracker, delivered from domains such as pixel.rubiconproject.com, is embedded into the Website and executes automatically when users load a page. Fiddler logs show an outbound GET request to https://pixel.rubiconproject.com/tap.php?...&gdpr_consent=..., confirming that Dove.com establishes real-time communication with Rubicon's ad exchange infrastructure. The transmitted payload includes event type, timestamp, referrer URL, user-agent, and unique identifiers.

184.    Wireshark DNS timeline confirms that Magnite (formerly Rubicon) was contacted at the network level during the first seconds of the session. The DNS inquiry was captured by Wireshark which is set forth below in Figure 12:

**<u>Figure 12:</u>**



185.    Once executed, the Magnite Tracker enables cookie syncing and identifier propagation across programmatic marketplaces. By appending parameters such as put=... and nid=..., Magnite synchronizes its own identifiers with those of demand-side platforms (DSPs) and advertisers, allowing cross-site and cross-device behavioral tracking. The Fiddler captured and confirm that Magnite performed identity resolution by linking a dove.com visitor to an external advertising ID with the home page referrer specifically attached, which is set forth below in Figure 13:

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 13:**



186. Magnite's tracking supports Defendant's advertising and retargeting functions by monetizing raw behavioral data gathered during Dove Website visits. Visitors who browse Dove product pages are segmented into behavioral audiences that can be resold through Magnite's exchange to advertisers, who in turn deliver targeted ads across unrelated websites and apps.

187. DNS capture logs confirm successful resolution of pixel.rubiconproject.com, demonstrating that Defendant's Website initiated network-level connections to Magnite's servers. The Fiddler evidence in Figure 13 further shows that requests contained detailed session metadata, including IP addresses, user-agent strings, referrer information, and consent parameters.

188. Defendant embedded Magnite's tracking pixel into the Website without disclosing or obtaining consent, thereby allowing Magnite to persistently monitor user behavior across Dove.com and other sites within its exchange. These persistent identifiers enable Magnite to construct detailed, longitudinal browsing profiles of users.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

189. The Magnite Tracker operates as both a "process" and a "device," because it executes code on the user's device, captures signaling data, and transmits it to third-party servers for profiling. See *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

190. By embedding the Magnite Tracker, Defendant facilitated third-party interception of session metadata without user awareness, constituting a pen register and/or trap and trace process under CIPA. Defendant never obtained user consent or a court order to permit such interception.

191. The Magnite Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data. The Magnite Tracker is also at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

192. The Magnite Tracker captures non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data associated with the user and the Website. This metadata reflects addressing and routing details.

193. Through this process, the Magnite Tracker systematically engages in persistent user tracking, behavioral profiling, and audience segmentation, all without the user's awareness, consent, or meaningful ability to control the collection and dissemination of their personal browsing information. Moreover, by embedding the Magnite Tracker onto the Website, Defendant enabled Meta to track users' activity beyond the Website itself. The Magnite Tracker assigns persistent identifiers that allow Meta to monitor user behavior across multiple unrelated websites that also deploy Magnite's tracking technology. As a result, Magnite is able to compile detailed, longitudinal behavioral profiles of users based not only on their interactions with the Website, but also on their broader browsing activities across the internet. This cross-site tracking occurs without the user's awareness or consent, further exacerbating the privacy

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  invasions resulting from Defendant's conduct.

2      194.   The Magnite Tracker initiates a connection to Magnite's advertising servers
3  (typically at https://www.facebook.com/tr/?id=...) upon page load. This connection
4  transmits routing and signaling metadata, including the user's IP address, user-agent
5  string, full URL path, referrer header, and timestamp. These data points enable Magnite
6  to identify both the source and destination of the communication, facilitate user ID
7  synchronization across sites, and support the construction of cross-site user profiles for
8  targeted advertising and audience segmentation. Accordingly, the Magnite Tracker
9  functions as a pen register and/or trap and trace device and/or process.

10      195.   Defendant never obtained a court order permitting the installation of a pen
11  register or trap and trace device or process and did not obtain Plaintiff's or the Class
12  Members' consent to install the Magnite Tracker or to collect or share data with Magnite.
13  Defendant's secret installation of the Magnite Tracker on the Website violates CIPA
14  regarding unauthorized use of a pen register and/or trap and trace device without prior
15  consent or court order.

16            **VI.**    **CLASS ALLEGATIONS**

17      196.   Plaintiff brings this action individually and on behalf of all others similarly
18  situated (the "Class" or "Class Members") defined as follows:

19      All persons within California whose browser was subject to installation,
20  execution, embedding, or injection of the Trackers by the Defendant's Website during
21  the relevant statute of limitations period.

22      197.  **NUMEROSITY:**  Plaintiff does not know the number of Class Members
23  but believes the number to be in the thousands, if not more. The exact identities of Class
24  Members can be ascertained by the records maintained by Defendant.

25      198.  **COMMONALITY:**  Common questions of fact and law exist as to all
26  Class Members and predominate over any questions affecting only individual members
27  of the Class. Such common legal and factual questions, which do not vary between Class

28

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

199. **TYPICALITY:** As a person who visited Defendant's Website and whose metadata was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

200. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

201. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## VII.    <u>FIRST CAUSE OF ACTION</u>

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

202.    Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

203.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

204.    Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

205.    Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates CIPA;

3. An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein;

5. Statutory damages pursuant to CIPA;

6. Prejudgment interest;

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

7. Reasonable attorney's fees and costs; and

8. All other relief that would be just and proper as a matter of law or equity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Dated:   November 7, 2025        Respectfully submitted,

**NATHAN & ASSOCIATES, APC**

By:  */s/ Reuben D. Nathan*
Reuben D. Nathan, Esq. (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED