Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MONICA DAWKINS

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA DAWKINS, on behalf of herself and all similarly situated persons,<br><br>         Plaintiff,<br><br>v.<br><br>UNILEVER UNITED STATES, INC., a Delaware corporation,<br><br>         Defendants. | Case No: 5:25-cv-02378-SVW-DTB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date: January 5, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A (10th Floor)<br>Judge: Stephen V. Wilson<br><br>Complaint Filed: February 12, 2025<br>FAC Filed: November 7, 2025 |

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................... 1

II.   THE FIRST AMENDED COMPLAINT ADEQUATELY ALLEGES THE
      ELEMENTS OF A SECTION 638.51 VIOLATION ......................................... 3

III.  STATUTORY FRAMEWORK, SECTION 638.51 ELEMENTS, AND THE
      PLEADING STANDARD ................................................................... 5

IV.   PLAINTIFF ESTABLISHES EACH REQUIRED ELEMENT ....................... 6

      A.   Device Or Process ................................................................ 7

      B.   Dras Information: Dialing, Routing, Addressing, And Signaling
           Information ......................................................................... 7

      C.   Contemporaneous Interception ............................................... 9

      D.   The Incidental Content Issue Is A Minimization Question, Not A
           Definitional Bar To Dras Classification ................................... 9

      E.   Lack Of Consent Cannot Support Dismissal Where Plaintiff Alleges
           Undisclosed Tracking .......................................................... 11

      F.   Wrongful Purpose: Undisclosed Commercial Monetization Through Third-
           Party Ad-Tech Transmission ................................................. 12

V.    PLAINTIFF ESTABLISHES ARTICLE III STANDING ............................... 12

VI.   THE COURT HAS SPECIFIC JURISDICTION UNDER *BRISKIN* .............. 13

VII.  THE PARTY EXCEPTION DOES NOT APPLY: REAL-TIME
      TRANSMISSION TO INDEPENDENT THIRD PARTIES DISTINGUISHES
      THIS CASE ............................................................................... 15

VIII. UNILEVER'S STATUTORY CONSTRUCTION ARGUMENTS FAIL:
      CALIFORNIA COURTS CONSTRUE CIPA BROADLY ............................. 17

IX.   THE CCPA DOES NOT DISPLACE SECTION 638.51 ................................. 18

X.    HARMLESS PLEADING DEFECT; UNILEVER'S CORPORATE
      STRUCTURE DOES NOT WARRANT DISMISSAL ................................. 19

XI.   CONCLUSION ........................................................................... 19

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ashcroft v. Iqbal*,

    556 U.S. 662 (2009) ...................................................................................6

*Aviles v. LiveRamp, Inc.*,

    2025 Cal. Super. LEXIS 776 (Los Angeles Super. Ct.

    Jan. 28, 2025) ...........................................................2, 6, 10, 11, 12, 17, 18

*Bell Atlantic Corp. v. Twombly*,

    550 U.S. 544 (2007) ...................................................................................6

*Briskin v. Shopify, Inc.*,

    135 F.4th 739 (9th Cir. 2025)............................................................2, 13, 14

*Carroll v. J.M. Smucker Co.*,

    2023 U.S. Dist. LEXIS 10452 (N.D. Cal. June 15, 2023) .....................7

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,

    592 U.S. 351 (2021) ...........................................................................2, 14

*Graf v. Zynga Game Network Inc.* (*In re Zynga Privacy Litigation*),

    750 F.3d 1098 (9th Cir. 2014) .................................................................10

*Heiting v. HP Inc.*,

    2025 Cal. Super. LEXIS 60774 (Los Angeles Super. Ct.

    Aug. 1, 2025)..........................................................2, 6, 10, 11, 12, 16, 17, 18

*In re Certified Question of Law*,

    858 F.3d 591 (FISCR 2017) ....................................................................10

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,

    2023 U.S. Dist. LEXIS 117696 (D. Del. July 10, 2023) ..................8, 11

*In re Google Inc. Gmail Litig.*,

    2013 WL 5423918 (N.D. Cal. Sep. 26, 2013) .......................................7

*Jones v. Bloomingdales.com, LLC*,

    124 F.4th 535 (8th Cir. 2024) ...........................................................2, 11

*Konop v. Hawaiian Airlines, Inc.*,

    302 F.3d 868 (9th Cir. 2002) ..................................................................2, 9, 11, 16

*Mejia v. Reed*,

    31 Cal.4th 657 (2003) ......................................................................................18

*NovelPoster v. Javitch Canfield Group*,

    140 F. Supp. 3d 938 (N.D. Cal. 2014) ............................................................9

*People v. Avery*,

    27 Cal. 4th 49 (2002) ......................................................................................12

*People v. Nakai*,

    183 Cal. App. 4th 499 (2010) ..........................................................................12

*Popa v. Microsoft Corp.*,

    153 F.4th 784 (9th Cir. Aug. 26, 2025) ............................................................13

*Rogers v. Ulrich*,

    52 Cal. App. 3d 894 (1975) ..................................................................15, 16, 17

*Shah v. Fandom, Inc.*,

    754 F. Supp. 3d 924 (N.D. Cal. 2024) ..........................................................5, 7

*Spokeo, Inc. v. Robins*,

    578 U.S. 330 (2016) ......................................................................................3, 12

*Steilberg v. Lackner*,

    69 Cal. App. 3d 780 (1977) ............................................................................17

*Tavernetti v. Superior Court*,

    22 Cal. 3d 187 (1978) ..............................................................................5, 15, 17

*TransUnion LLC v. Ramirez*,

    594 U.S. 413 (2021) ..................................................................................3, 12, 13

*United States v. Forrester*,

    512 F.3d 500 (9th Cir. 2008) ..................................................2, 6, 7, 8, 10, 17, 18

*United States v. Reed*,

    575 F.3d 900 (9th Cir. 2009) ............................................................................9

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

*United States v. VanDyck*,

    776 F. App'x 495 (9th Cir. 2019) ..................................................2, 6, 7, 8, 17, 18

*Warden v. Kahn*,

    99 Cal. App. 3d 805 (1979) .......................................................5, 15, 17

**STATUTES**

Cal. Civ. Code § 1798.100 *et seq* ...............................................18

Cal. Penal Code § 631 .....................................................2, 15

Cal. Penal Code § 638.50(c) .................................................16

Cal. Penal Code § 638.51 ...................1, 2, 3, 5, 6, 8, 10, 11, 12, 15, 16, 17, 18, 19

Cal. Penal Code § 638.52(d) ..................................................8

**OTHER AUTHORITIES**

California Consumer Privacy Act ("CCPA") ...................................18, 19

California Invasion of Privacy Act ("CIPA") ..............................5, 7, 9, 15, 17

**RULES**

Fed. R. Civ. P. 12(b)(6) ..................................................6, 19

Fed. R. Civ. P. 15 ..........................................................19

Fed. R. Civ. P. 15(a) .......................................................19

Fed. R. Civ. P. 25(c) .......................................................19

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I.    INTRODUCTION**

Defendant seeks dismissal of a single cause of action alleging a straightforward violation of California Penal Code § 638.51. When Plaintiff visited Defendant's website from within California, Defendant secretly deployed software that caused her browser to transmit dialing, routing, addressing, and signaling ("DRAS") information including URLs reflecting her product inquiries, referrer headers revealing her navigation path, device-identifying information, and routing metadata to multiple third parties in real time, without a court order and without her knowledge or consent. First Amended Complaint [Dkt No. 14] ("FAC") ¶¶ 2–3, 7–8, 10–12, 47–48, 59–67, 82–86, 88–100, 146–147, 150–195. Section 638.51 prohibits exactly this conduct.

The Motion to Dismiss [Dkt No. 20] (the "Motion") attempts to recast this case as a challenge to routine, first-party website analytics. It is not. Plaintiff does not challenge a website operator's disclosed collection of limited technical information for its own use. Plaintiff challenges Defendant's undisclosed use of third-party tracking and analytics code to identity-tag her, geolocate her, and share granular behavioral and device-level information with multiple independent ad-tech entities that profile her, aggregate her browsing history, and monetize her interest in Defendant's products even if she never makes a purchase. FAC ¶¶ 2, 7, 10, 12, 27, 51, 53, 55, 59, 89–100, 101, 102, 146–147, 150–156, 181, 186, 194. Using hidden software to convert a consumer's private communications into a multi-party commercial asset without consent is the kind of conduct section 638.51 forbids.

Defendant's reference to websites operated by courts and by Plaintiff's counsel only underscores the distinction. Those examples involve first-party collection of limited technical data for site operation, not the deployment of third-party tracking infrastructure designed to capture and share user-level DRAS with ad-tech partners and intermediaries. FAC ¶¶ 7, 10, 12, 20, 101, 150–156. The gravamen here is Defendant's non-consensual

sharing of Plaintiff's DRAS information with third parties, not the mere reception of communications by a website operator.

On the law, the Motion rests on a series of misinterpretations. It proposes an artificially narrow definition of DRAS that no California court has adopted, ignoring authorities holding that URLs, IP addresses, referrer paths, and similar web-browsing metadata are modern addressing and routing information within the meaning of section 638.51. See, e.g., *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008); *United States v. VanDyck*, 776 F. App'x 495 (9th Cir. 2019); *Heiting v. HP Inc.*, 2025 Cal. Super. LEXIS 60774 (Los Angeles Super. Ct. Aug. 1, 2025); *Aviles v. LiveRamp, Inc.*, 2025 Cal. Super. LEXIS 776 (Los Angeles Super. Ct. Jan. 28, 2025). It advances a consent theory that squarely conflicts with the Ninth Circuit and other recent authorities holding that consent cannot be inferred from mere website use or undisclosed tracking and cannot be resolved on the pleadings where a plaintiff alleges no notice and no awareness of third-party interception. See *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002); *Jones v. Bloomingdales.com, LLC*, 124 F.4th 535 (8th Cir. 2024). Unilever also asserts a party exception theory based on California Penal Code § 631 case law, arguing that because it participated in Plaintiff's web session, it cannot have intercepted her communications; but that theory rests on a misapplication of wiretap principles to the distinct pen-register and trap-and-trace scheme of section 638.51, and ignores that Plaintiff alleges Unilever directed signaling information to separate third-party ad-tech entities for their independent commercial use, not mere passive receipt of a bilateral communication.

Defendant's jurisdictional and standing challenges fare no better. Under the Ninth Circuit's en banc decision in *Briskin v. Shopify, Inc.*, a defendant purposefully directs activity to a forum when it structures its technology to extract data from users it knows will include forum residents, and a claim relates to those contacts where it arises from that data extraction. *Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025); see also *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351 (2021). Plaintiff alleges

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

that she accessed the site from California and that Defendant designed the site to capture her DRAS data for commercial use, easily satisfying specific jurisdiction. FAC ¶¶ 2, 7, 16, 20, 89–100, 150–156, 181, 186, 194. And unauthorized interception and dissemination of private communications to third parties is a historically recognized privacy injury that confers Article III standing. See *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).

Because the First Amended Complaint plausibly alleges each element of a section 638.51 violation, defeats Defendant's consent and party-exception arguments, and establishes both Article III standing and personal jurisdiction, the Motion to Dismiss should be denied.

## II.    THE FIRST AMENDED COMPLAINT ADEQUATELY ALLEGES THE ELEMENTS OF A SECTION 638.51 VIOLATION

Plaintiff MONICA DAWKINS is a California citizen residing in Riverside County. FAC ¶ 16. She was physically present in California when she visited Defendant's website during the statutory period, and the FAC's allegations are directed to the website as it was configured at the time of her visit. FAC ¶¶ 15-16, 23-24. As a result of her direct interaction with the site, Plaintiff's browser generated and transmitted detailed records of the pages she viewed, how she navigated between them, and how long she remained on each page, including product-specific URLs, referrer links showing the sequence of pages visited, and timing values indicating engagement. FAC ¶¶ 10, 44-47, and 88. This data reflected the substance of Plaintiff's browsing behavior rather than merely anonymous or generic connection information. *Id*.

The FAC further alleges five concrete examples of Plaintiff's personal browsing details being transmitted to specific third parties. Defendant's website transmitted Plaintiff's browsing of body-wash products to Google, including the URL, referrer path, and timing information. FAC ¶ 151. It transmitted her browsing of deodorant products to Meta, including the referrer and movement path; a shampoo-related browsing event to TikTok, including the active and referring location; and installed software that

permitted Pinterest to log her page-view event regarding Defendant's hair-care products. FAC ¶¶ 152–154. The site also triggered communications with Adobe's Experience Cloud carrying the page title Dove US Product Listing and the content channel Body Wash, identifying the precise portion of the site viewed and its thematic category and evidencing Adobe's collection of contextual behavioral data. FAC ¶ 155. Collectively, these interactions show that Defendant's website captured and transmitted granular, user-level behavioral information about Plaintiff's session, including the pages she visited, the order in which she viewed them, and the duration of her engagement, to multiple third-party advertising and analytics entities, rather than merely exchanging anonymous technical metadata. FAC ¶¶ 7, 12, 150–156.

The third parties that received this data were not acting as neutral service providers. Instead, the FAC alleges that they collected and used Plaintiff's personal information for their own independent purposes tied to broader advertising ecosystems, profiling, and data-monetization strategies, combining it with information from other websites and IP-based identifiers to build comprehensive user profiles and track Plaintiff across the internet. FAC ¶¶ 7, 12. Throughout the complaint, Plaintiff is expressly encompassed within the references to "users," and the FAC alleges that she did not consent to the installation of the trackers or to the disclosure and monetization of her behavioral data. FAC ¶¶ 13, 15. When she accessed the website, her browser initiated GET requests that resulted in delivery and installation of tracking software on her browser, including a unique identifier allowing third parties to track her use of the site over multiple visits and across her broader web activity. FAC ¶¶ 44–45.

Plaintiff specifically alleges that she did not consent to Defendant's deployment of tracking software or the disclosure or monetization of her behavioral data, and that Defendant undertook these acts without a court order. FAC ¶¶ 13–14, 49, 80, 168, 182, 190, 195. Nonetheless, her de-anonymized personal information and browsing behavior were shared with third parties in the manner described above. FAC ¶¶ 101, 150–156.

/ / /

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

Case 5:25-cv-02378-SVW-DTB    Document 23    Filed 12/18/25    Page 10 of 26    Page ID #:319

## III. STATUTORY FRAMEWORK, SECTION 638.51 ELEMENTS, AND THE PLEADING STANDARD

California Penal Code § 638.51 makes it unlawful for any person to install or use a pen register or trap and trace device, or to install or use a device or process which records or decodes dialing, routing, addressing, or signaling information without a court order or the consent of the user. The California Supreme Court has recognized that the California Invasion of Privacy Act ("CIPA") is a privacy-protecting scheme whose dominant objective is to protect the right of privacy of the people of this state and has applied its provisions and exemptions in a manner that preserves that privacy-protective purpose rather than narrowing it through strained interpretations. See *Tavernetti v. Superior Court*, 22 Cal. 3d 187 (1978); *Warden v. Kahn*, 99 Cal. App. 3d 805 (1979).

Although section 638.51 was enacted against a backdrop of traditional telephone signaling, section 638.50's definition of a 'pen register', focusing on the collection of 'dialing, routing, addressing, or signaling' information through a 'device or process', is phrased in technology-neutral terms and comfortably extends to modern electronic communications. Courts applying CIPA have emphasized that this definition is specific about the type of data but deliberately inclusive as to the form of the collection mechanism, and have treated software-based tracking tools as a qualifying 'process' where they identify users and capture addressing information such as IP addresses associated with HTTP requests. See, e.g., *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024) (relying on Greenley to describe 'device or process' as a broad, result-oriented concept and recognizing IP addresses as 'addressing' information rather than content).

In determining the technical scope of DRAS information under CIPA, courts often look to federal pen-register precedent. The Ninth Circuit has explained that surveillance of the to/from addresses of emails and IP-address-level information about websites visited is analogous to traditional pen-register collection of dialed numbers because it captures non-content addressing data used to route communications rather than their

5

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

substantive content. See *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008). Later Ninth Circuit decisions similarly treat pen-register and trap-and-trace statutes as aimed at non-content signaling information associated with routing electronic communications. See, e.g., *United States v. VanDyck*, 776 F. App'x 495 (9th Cir. 2019). Recent California trial-court decisions applying Cal. Penal Code § 638.51 in web-tracking cases have drawn on this framework, reasoning that IP addresses, certain URL or referrer data, device identifiers, and similar browsing metadata operate as modern routing or addressing information and can fall within the statutory phrase 'dialing, routing, addressing, or signaling information,' while still requiring that the challenged tool not capture content. See *Aviles v. LiveRamp, Inc.*, 2025 Cal. Super. LEXIS 776 (Los Angeles Super. Ct. Jan. 28, 2025); *Heiting v. HP Inc.*, 2025 Cal. Super. LEXIS 60774 (Los Angeles Super. Ct. Aug. 1, 2025), as described in contemporary practitioner summaries.

At the pleading stage, a complaint survives an FRCP 12(b)(6) motion where its factual allegations plausibly suggest an entitlement to relief, meaning they allow the court to draw a reasonable inference of liability when accepted as true and viewed in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Measured against this standard and the broad, technology-neutral construction of section 638.51, Plaintiff's allegations readily state a claim: Unilever is alleged to have used software-based devices or processes to record DRAS information from Plaintiff's communications, without a court order, without her consent, and for the wrongful commercial purpose of enabling multi-party tracking and monetization of her online activity.

## IV.   PLAINTIFF ESTABLISHES EACH REQUIRED ELEMENT

Section 638.51 has five components: (A) use of a device or process, (B) that records or decodes DRAS information, (C) without a court order, (D) without the user's consent, and (E) for a wrongful or unauthorized purpose. The FAC plausibly alleges each element.

/ / /

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

## A.    Device or Process

Device or process is construed broadly under CIPA. California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted. *In re Google Inc. Gmail Litig.*, 2013 WL 5423918 (N.D. Cal. Sep. 26, 2013); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024). In analogous federal pen-register contexts, courts have recognized that addressing information used in routing electronic communications, including URLs and IP addresses, constitutes routing and addressing information covered by pen-register statutes. *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008); *United States v. VanDyck*, 776 F. App'x 495 (9th Cir. 2019).

## B.    DRAS Information: Dialing, Routing, Addressing, and Signaling Information

The Ninth Circuit has treated pen-register concepts as applying to non-content data that functions as addressing or routing information for electronic communications, including email addressing information and IP-address-level information about websites visited, analogizing this to dialed telephone numbers. See *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008) (upholding surveillance that captured to/from email addresses and IP addresses associated with visited websites as the electronic equivalent of traditional pen-register data). In a later case, the Ninth Circuit relied on Forrester in evaluating pen-register and trap-and-trace collection in an electronic environment, again treating the statutes as aimed at non-content signaling or routing information rather than message content. See *United States v. VanDyck*, 776 F. App'x 495 (9th Cir. 2019).

District courts addressing web-tracking technologies have drawn on this framework. For example, in *Carroll v. J.M. Smucker Co.*, the court distinguished between content and non-content data and treated information such as referrer URLs, IP addresses, and browser-level metadata as addressing or routing-type information under the federal scheme, rather than as the substance of users' communications. See *Carroll v. J.M. Smucker Co.,* 2023 U.S. Dist. LEXIS 104522 (N.D. Cal. June 15, 2023). Another

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

decision in *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 2023 U.S. Dist. LEXIS 117696 (D. Del. July 10, 2023) likewise approached web-tracking regimes through the lens of pen-register and similar non-content collection doctrines, focusing on the functional role of the data in directing or identifying communications rather than on the specific technology used.

Here, the FAC alleges that Unilever's embedded analytics and tracking code captured precisely this sort of non-content technical data: URLs corresponding to specific product pages Plaintiff visited; referrer paths showing the sequence of pages navigated; IP addresses; device and browser characteristics; and session-level metadata such as timing, duration, and navigation depth. FAC ¶¶ 5, 10–12, 44–45, 79, 88–100, 150–157, 170, 179, 181, 186, 194–195. Those allegations describe information that identifies the endpoints and path of the communications and how the browser interacted with the site, rather than the substantive content of what was viewed or typed. Under the *Forrester/VanDyck* line of cases, that is exactly the type of 'dialing, routing, addressing, or signaling' information pen-register statutes are concerned with.

Defendant's attempt to narrow section 638.51 by invoking Cal. Penal Code § 638.52(d)'s order-content requirements is therefore misplaced. Section 638.52(d) specifies the details a court order must include (such as identifying the line or facility to which a pen register is to be attached); it does not redefine what counts as DRAS. The pen-register cases emphasize that the analysis turns on the kind of information being collected(addressing and routing versus content) rather than the particular medium or implementation. See *Forrester*, 512 F.3d. On that technology-neutral understanding, modern web-tracking data like URLs, IP addresses, and referrer paths fits comfortably within the statutory category of dialing, routing, addressing, or signaling information when it is used to identify and route electronic communications between users' browsers and a website.

/ / /

8

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

## C.  Contemporaneous Interception

Federal courts distinguish between an interception of a communication, which occurs when the acquisition happens while the communication is in transit, and later access to stored copies of that communication. The Ninth Circuit has applied this distinction in the Wiretap Act context, treating acquisition that occurs during transmission as interception and post-transmission access to stored data as outside that category. See *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002); *United States v. Reed*, 575 F.3d 900 (9th Cir. 2009). District courts have carried this contemporaneity principle over to computer and web-based surveillance, concluding that software which captures communications or signaling information as they are being transmitted can satisfy an interception requirement, whereas purely retrospective retrieval from storage does not. See *NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 938 (N.D. Cal. 2014). California courts analyzing CIPA's pen-register and trap-and-trace provisions have followed a similar approach, focusing on whether web-tracking code executes during the user's interaction with the site and records navigation or signaling data in real time, as opposed to merely querying historical logs.

Here, the FAC alleges that Defendant's embedded trackers ran automatically when Plaintiff's pages loaded and recorded her DRAS data, such as URLs visited, referrer paths, and other navigation-related signals, as she browsed the site. FAC ¶¶ 44–45, 150–157, 170, 179, 181, 186, 194–195. Taken as true at the pleading stage, those allegations describe acquisition of routing and signaling information during the transmission of Plaintiff's communications, which is sufficient to meet the contemporaneous-interception requirement for purposes of a motion to dismiss.

## D.  The Incidental Content Issue Is a Minimization Question, Not a Definitional Bar to DRAS Classification

Unilever's contention that tools capturing full page URLs cannot qualify as trap-and-trace devices because URLs reveal webpage content blurs the line between routing data and content. The statutory focus is on dialing, routing, addressing, and

signaling information(technical data used to direct communications), and not on the underlying subject matter of what is viewed.

Federal courts applying pen-register concepts have treated things like IP-address-level information and certain URL or referrer data as non-content addressing information used to route communications, even while recognizing that some URL strings may incidentally suggest what a user is viewing. See, e.g., *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008); *In re Certified Question of Law*, 858 F.3d 591 (FISCR 2017) (emphasizing limits and minimization rather than redefining devices based on potential content exposure). The Ninth Circuit's later decision in *Graf v. Zynga Game Network Inc.* (*In re Zynga Privacy Litigation)* likewise maintains a distinction between addressing information and content in the online context. *Graf v. Zynga Game Network Inc.* (*In re Zynga Privacy Litigation),* 750 F.3d 1098 (9th Cir. 2014).

California trial courts applying section 638.51 in web-tracking cases have adopted the same basic structure, treating IP addresses, certain URLs or referrer headers, device identifiers, and navigation paths as modern forms of routing or signaling data that fall within the DRAS definition, while separately considering any content implications. See *Heiting v. HP Inc.*, 2025 Cal. Super. LEXIS 60774 (Los Angeles Super. Ct.  Aug. 1, 2025); *Aviles v. LiveRamp, Inc.*, 2025 Cal. Super. LEXIS 776 (Los Angeles Super. Ct. Jan. 28, 2025).

Here, the FAC alleges that Unilever's embedded code captured product-specific URLs, referrer paths showing the sequence of pages visited, IP addresses, device identifiers, and related session metadata and transmitted that data in real time to third-party endpoints. FAC ¶¶ 5, 10–12, 44–45, 79, 88–100, 150–157, 170, 179, 181, 186, 194–195. Those allegations describe the collection of routing and signaling information associated with Plaintiff's communications with the website, which fits within section 638.50's DRAS category even if some of that technical data also implies what type of page she was viewing.

/ / /

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

**E.     Lack of Consent Cannot Support Dismissal Where Plaintiff Alleges Undisclosed Tracking**

Consent to interception is an affirmative defense and cannot support dismissal at the pleading stage where the complaint alleges a lack of disclosure and no actual agreement to DRAS transmission. Federal courts apply an actual consent standard that does not permit consent to be inferred from mere website use or silence. See *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002) (establishing actual-consent requirement in the Ninth Circuit context). District courts applying Ninth Circuit standards have held that continued use of a website does not constitute consent to undisclosed third-party tracking. See *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 2023 U.S. Dist. LEXIS 117696 (D. Del. July 10, 2023).

Courts in other circuits have examined similar consent questions and reached consistent conclusions: whether a user consented to embedded analytics or tracking code presents a fact-dependent question unsuitable for Rule 12 dismissal when the pleadings allege no disclosure or prior notice, and consent cannot rest on an unagreed privacy policy or on inferred intent from site navigation. See *Jones v. Bloomingdales.com, LLC*, 124 F.4th 535 (8th Cir. 2024). California trial courts addressing section 638.51 consent defenses in web-tracking contexts have applied analogous reasoning, treating the absence of notice or an authorizing mechanism as inconsistent with informed consent to DRAS transmission. See *Aviles v. LiveRamp, Inc.*, 2025 Cal. Super. LEXIS 776 (Los Angeles Super. Ct. Jan. 28, 2025); *Heiting v. HP Inc.*, 2025 Cal. Super. LEXIS 60774 (Los Angeles Super. Ct. Aug. 1, 2025).

Here, the FAC alleges that Plaintiff received no banner notification, explanation, or mechanism to authorize transmission of her DRAS data to third-party trackers, and had no awareness that third parties were intercepting her communications. FAC ¶¶ 10–14, 49, 79–80, 150–157, 168, 181, 182, 186, 190, 195. Taken as true, those allegations preclude dismissal on a consent defense and require further factual development.

/ / /

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    **F.    Wrongful Purpose: Undisclosed Commercial Monetization Through**
2    **Third-Party Ad-Tech Transmission**

3    California courts interpreting the wrongful purpose element of section 638.51
4    treat it as satisfied when a defendant acts with intent to capture or transmit data in a
5    manner inconsistent with statutory privacy protections. See *People v. Avery*, 27 Cal. 4th
6    49 (2002) (defining wrongful intent as acting contrary to law or the privacy rights the
7    statute protects); *People v. Nakai*, 183 Cal. App. 4th 499 (2010) (characterizing wrongful
8    purpose as intent to invade privacy beyond what the law permits). In the web-tracking
9    context, California trial courts have recognized that undisclosed transmission of user
10   DRAS data to commercial partners for analytics, profiling, or identity resolution
11   constitutes wrongful purpose under section 638.51 because such collection and sharing
12   occurs without authorization and contradicts the statute's privacy protective aim. See
13   *Heiting v. HP Inc.*, 2025 Cal. Super. LEXIS 60774 (Los Angeles Super. Ct. Aug. 1,
14   2025) (hidden data capture for commercial analytics purposes); *Aviles v. LiveRamp, Inc.*,
15   2025 Cal. Super. LEXIS 776 (Los Angeles Super. Ct. Jan. 28, 2025) (transmission of
16   DRAS data to identity-resolution partners without authorization).

17   Here, the FAC alleges that Unilever configured its website to transmit Plaintiff's
18   DRAS data to analytics and third-party partners without disclosure or consent, for
19   purposes of commercial enrichment through profiling and targeted marketing. FAC ¶¶
20   2, 7, 10–12, 27, 51, 53, 55, 59, 89–100, 101–102, 146–147, 150–157, 181, 186, 194–
21   195. Those allegations suffice to plead wrongful purpose at the pleading stage.

22   **V.    PLAINTIFF ESTABLISHES ARTICLE III STANDING**

23   Unauthorized collection and transmission of private browsing data to third parties
24   for identification, profiling, and monetization constitutes a concrete injury supporting
25   Article III standing. The Supreme Court has established that intangible privacy harms
26   are concrete when they relate to injuries historically recognized as actionable at common
27   law. See *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Spokeo, Inc. v. Robins*, 578
28   U.S. 330 (2016).

The Ninth Circuit's recent decision in *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. Aug. 26, 2025), involved passive collection of generic browsing metadata without allegations of re-identification or targeted profiling infrastructure. Here, by contrast, the FAC alleges that Unilever embedded tracking code causing Plaintiff's browser to transmit identifying signals, including IP address, device identifiers, referrer paths, and navigation metadata, to identity-resolution and advertising firms including Meta Platforms, The Trade Desk, Magnite, and Adobe, which use that data to re-identify and track Plaintiff across multiple websites. FAC ¶¶ 10–12, 78–79, 89–100, 101–102, 141–147.

The third parties receiving Plaintiff's data are not passive observers but active re-identifiers who combine IP addresses, device fingerprints, and behavioral signals to build comprehensive user profiles and track activity across the Internet. FAC ¶¶ 12, 101, 142–147. This systematic, non-consensual collection and repurposing of routing information for monetization through advertising networks represents a loss of anonymity—a historically recognized privacy invasion similar to wrongful dissemination of identifying information.

The FAC further alleges that Unilever deliberately configured this tracking infrastructure to target California residents, incorporating California-headquartered ad-tech companies and using geolocation technology to display California-specific privacy notices. FAC ¶¶ 24–29. These allegations establish that Plaintiff's privacy injury is fairly traceable to Unilever's intentional conduct and redressable through injunction and damages. See *TransUnion*, 594 U.S. at 424. Plaintiff's Article III standing is satisfied.

## VI. THE COURT HAS SPECIFIC JURISDICTION UNDER *BRISKIN*

Unilever's personal jurisdiction challenge is foreclosed by the Ninth Circuit's framework in *Briskin v. Shopify, Inc.*, which holds that a defendant purposefully directs activity to a forum by designing and deploying technology to collect data from forum residents, and that such data extraction constitutes a forum contact when the plaintiff's claim arises from that extraction. *Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025).

The court rejected arguments that server location or corporate headquarters determine the analysis, emphasizing instead that intentional collection of data from forum residents is the relevant contact. *Id*. at 951.

The Supreme Court's approach in *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court* reinforces this analysis, requiring only that a claim relate to a defendant's forum contacts; strict but-for causation is unnecessary provided the connection is not random, fortuitous, or attenuated. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court,* 592 U.S. 351 (2021). The Ninth Circuit applies this flexible arising out of or relating to standard when assessing jurisdiction over out-of-state defendants whose conduct targets forum residents.

The FAC alleges that Plaintiff accessed the Website from California and that Unilever deliberately designed and configured the site to collect DRAS and behavioral data from users it knew would include California residents, employing California-centered tracking infrastructure and vendors. FAC ¶¶ 16, 23–30. The Website implements IP-based geolocation via OneTrust to display California-specific privacy notices and a Do Not Sell My Personal Information link to California visitors, demonstrating that Unilever intentionally identifies and segments California users. FAC ¶¶ 27, 29–30. The FAC further alleges that Unilever selected third-party ad-tech and identity-resolution partners headquartered in California or operating major processing nodes there, including Meta Platforms, The Trade Desk, Magnite, and others. FAC ¶¶ 24–28.

Under *Briskin* and *Ford*, this combination of deliberate design, California-focused data extraction, use of California-based vendors, and California-specific privacy workflows establishes purposeful direction of activity toward California residents. The resulting privacy injury(unauthorized interception and monetization of Plaintiff's DRAS through California-centered infrastructure) is logically connected to Unilever's California contacts. Personal jurisdiction is proper.

/ / /

14

## VII.  THE PARTY EXCEPTION DOES NOT APPLY: REAL-TIME TRANSMISSION TO INDEPENDENT THIRD PARTIES DISTINGUISHES THIS CASE

Section 638.51 contains no express party exception, and Unilever's effort to import one from section 631 case law misapplies a wiretap provision to a distinct pen register statute. The critical issue is not whether Unilever participated in the web session, but whether it deployed a device or process to capture and transmit DRAS to third parties without authorization.

Plaintiff does not allege that Unilever merely logged its own server records. Rather, Plaintiff alleges that Unilever embedded tracking software that automatically executed during her session and caused her browser to transmit DRAS information, including IP addresses, device identifiers, referrer headers, and navigation sequences, to separate third-party servers operated by Meta, The Trade Desk, and Magnite for their independent commercial use. FAC ¶¶ 5–8, 10–12, 45, 89–100, 141–147. This tripartite architecture is software-engineered specifically to route signaling information to external entities for identity resolution, cross-site tracking, and profiling. That is precisely what section 638.51 regulates.

Unilever relies on *Rogers v. Ulrich*, 52 Cal. App. 3d 894 (1975), for the proposition that a party cannot intercept its own communication. But *Rogers* applied section 631's third-party wiretap prohibition; it did not address pen registers under section 638.51. Section 631 has long been understood to apply only to third-party interception, not recording by a participant. *Warden v. Kahn*, 99 Cal. App. 3d 805 (1979). But section 638.51 uses different language, prohibiting any person who install[s] or use[s] a device that captures DRAS, and contains no textual party exception. *Tavernetti v. Superior Court*, 22 Cal.3d 187 (1978) (explaining that CIPA's provisions address distinct harms). The section 631 participant-recording rule does not export to section 638.51's pen register scheme. Moreover, even if it did, *Rogers* addressed bilateral telephone conversations; here, Plaintiff alleges Unilever

15

deployed software to route her DRAS to external entities not party to her web session. That does not fit *Rogers*'s bilateral paradigm.

Unilever also relies on *Heiting v. HP Inc.*, 2025 Cal. Super. LEXIS 60774 (Los Angeles Super. Ct. Aug. 1, 2025), arguing that section 638.51 does not apply when a website operator deploys tracking software. But *Heiting* involved first-party logging: HP deployed TikTok's pixel to identify visitors to HP's own site for HP's operational use. Here, by contrast, Unilever caused DRAS to flow to separate third-party endpoints operated by Meta, Trade Desk, and Magnite for their independent purposes, not for Unilever's site operations. FAC ¶¶ 10–12, 101–102, 142–147. The Trade Desk provides demand-side advertising and identity-graph services; Magnite operates advertising exchanges. These third parties are not passive service providers; they aggregate Plaintiff's data across the Internet and monetize it. This third-party transmission architecture distinguishes *Heiting* and shows section 638.51 applies when a website operator routes signaling information to external entities for their independent commercial use.

The statutory text confirms this. Section 638.50(c) defines a trap-and-trace device as one that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication. Cal. Penal Code § 638.50(c). The statute turns on what the device does(captures DRAS)not on who operates it. Here, Plaintiff alleges that Unilever's embedded code captured source-identifying impulses (IP addresses, device identifiers, referrer headers, session metadata) and caused them to be transmitted to third-party endpoints in real time as she navigated the site. FAC ¶¶ 45, 47, 79, 150–157, 170, 176, 181. That real-time, contemporaneous transmission, which is triggered by each page load and click, satisfies the capture and interception requirements. *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002) (capture requires contemporaneous acquisition during transmission). Where Plaintiff has plausibly alleged that Unilever deployed a device to capture and transmit

16

1   DRAS to separate third-party entities for their independent use, the complaint states a

2   claim under section 638.51. Dismissal on party-exception grounds is not warranted.

3   **VIII. UNILEVER'S STATUTORY CONSTRUCTION ARGUMENTS FAIL:**

4   **CALIFORNIA COURTS CONSTRUE CIPA BROADLY**

5       California courts construe CIPA broadly to effectuate its protective purpose and

6   resolve ambiguities in favor of privacy. See *Tavernetti v. Superior Court*, 22 Cal.3d 187

7   (1978); *Warden v. Kahn*, 99 Cal. App. 3d 805 (1979). That approach forecloses a

8   cramped reading confining DRAS to telephone numbers alone.

9       Section 638.51's language is technology-neutral, regulating devices and processes

10  that record dialing, routing, addressing, or signaling information without tethering those

11  terms to any single communication medium. California courts have declined to confine

12  privacy statutes to outdated technologies, instead applying them to any apparatus or

13  technique used to capture private communications. See *Rogers v. Ulrich*, 52 Cal. App.

14  3d 894 (1975); *Steilberg v. Lackner*, 69 Cal. App. 3d 780 (1977). *Heiting* recognized

15  that the Legislature chose language . . . broad enough to encompass modern electronic

16  signaling. *Heiting v. HP Inc.,* 2025 Cal. Super. LEXIS 60774.

17      Federal courts applying analogous pen-register concepts confirm that Internet-

18  routing data qualifies as DRAS. *Forrester* treats URLs, email addressing information,

19  and IP addresses as addressing information used in routing the communications. *United*

20  *States v. Forrester*, 512 F.3d 500 (9th Cir. 2008). *VanDyck* reiterates that pen-register

21  statutes encompass non-content signaling information used to route electronic

22  communications. *United States v. Vandyck,* 776 F. App'x 495 (9th Cir. 2019). California

23  trial courts applying section 638.51 have adopted that understanding, holding that URLs,

24  referrer headers, device identifiers, navigation paths, and similar web metadata fall

25  within dialing, routing, addressing, or signaling information. *Heiting v. HP Inc.,*  2025

26  Cal. Super. LEXIS 60774; *Aviles v. Liveramp, Inc.*, 2025 Cal. Super. LEXIS 776.

27

28  / / /

17

The FAC alleges precisely the signaling information and real-time transmissions these authorities recognize as DRAS: product-specific URLs, referrer paths, navigation sequences, IP addresses, device identifiers, and timestamps, all captured and transmitted by embedded tracking code to third-party ad-tech entities without consent. FAC ¶¶ 5, 10–12, 44–45, 79, 89–100, 101–102, 146–147, 150–157, 170, 179, 181, 186, 194–195. Under the governing statutory text and the case law from *Forrester*, *VanDyck*, *Heiting*, and *Aviles*, those allegations state a claim under section 638.51.

## IX.    THE CCPA DOES NOT DISPLACE SECTION 638.51

Unilever's argument that the California Consumer Privacy Act ("CCPA") implicitly supersedes Cal. Penal Code § 638.51 is foreclosed by California's strong canon against implied repeal. A later-enacted statute does not abrogate an earlier statute unless the Legislature clearly and unequivocally expresses that intent, and courts must harmonize statutes whenever a rational basis exists. See *Mejia v. Reed*, 31 Cal.4th 657 (2003). Nothing in the CCPA's text or history suggests intent to narrow or repeal section 638.51, and the Legislature has left section 638.51 unchanged through the CCPA's enactment and subsequent amendments.

The CCPA creates disclosure and consumer-rights obligations, including transparency, access, deletion, and Do Not Sell rights, but it does not authorize conduct that other statutes forbid, nor does it purport to limit criminal privacy prohibitions. See Cal. Civ. Code § 1798.100 *et seq.* The two regimes are easily harmonized: the CCPA regulates how businesses must inform consumers and honor statutory rights, while section 638.51 independently prohibits using any device or process to record or decode DRAS without a court order or consent. The fact that a website deploys CCPA-style notices or consent banners does not immunize it from liability under section 638.51.

Because the Legislature did not alter section 638.51 when enacting or amending the CCPA, and the CCPA nowhere authorizes undisclosed, multi-party interception and monetization of DRAS, there is no basis for implied repeal or limitation. The statutes

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

coexist, and Unilever cannot invoke the CCPA's framework to justify conduct section 638.51 expressly prohibits.

## X.    HARMLESS PLEADING DEFECT; UNILEVER'S CORPORATE STRUCTURE DOES NOT WARRANT DISMISSAL

Unilever argues that the FAC misnames the defendant because a Unilever subsidiary, not Unilever United States, Inc., operates the Website. However, this presents a pleading defect, not a merits bar.  On a Rule 12(b)(6) motion, the Court must accept as true Plaintiff's allegations that Unilever designed, controlled, and benefitted from the Website's tracking architecture. FAC ¶¶ 17–30. Whether Unilever exercised that control through a subsidiary or operating company is a corporate-law question, not grounds for dismissal on the merits of the section 638.51 claim.

The proper remedy for a misnomer is under Fed. R. Civ. P. Rule 15 (amendment) or Rule 25 (substitution), not dismissal. Fed. R. Civ. P. 15(a), 25(c). Plaintiff does not oppose identification of the true operating entity and can easily amend to name it, whether as a named subsidiary or through jurisdictional discovery.  This is a technical, readily curable defect. The Court should deny dismissal on this ground and permit amendment as of right or with leave. Plaintiff offers to amend within fourteen (14) days to identify the Unilever subsidiary operating the Dove Website, add factual allegations establishing corporate control or direction by Unilever United States, Inc., and conform the defendant's name to the true operator.

## XI.    CONCLUSION

The FAC plausibly alleges a violation of California Penal Code § 638.51 by pleading that Unilever embedded tracking code that captured and transmitted DRAS to third-party ad-tech entities without authorization or consent. Plaintiff establishes Article III standing through allegations of non-consensual third-party interception and commercial exploitation of her data. The FAC negates consent, forecloses any party-exception defense, and establishes specific personal jurisdiction. Unilever's narrow

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

construction of DRAS and implied-repeal arguments are foreclosed by the statute's text
and controlling authority.

Dated:   December 18, 2025        Respectfully submitted,


**NATHAN & ASSOCIATES, APC**


By:  */s/ Reuben D. Nathan*
Reuben D. Nathan, Esq. (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


*Attorneys for Plaintiff and the Putative Class*

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

**LOCAL RULE L.R. 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff, Monica Dawkins certifies that this brief contains 6,039 words, which complies with the word limit of L.R. 11-6.1.


Dated:   December 18, 2025        **NATHAN & ASSOCIATES, APC**


By:  */s/ Reuben D. Nathan*
Reuben D. Nathan, Esq.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT